UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

1210 COLVIN AVENUE, INC.,
  Now Known As Dash Markets, Inc.,

                      Plaintiff,

      -vs-

TOPS MARKETS, L.L.C.,

                Defendant.

03-CV-0425E(F)

MEMORANDUM

and

ORDER[1]

---

## INTRODUCTION

In this action, the plaintiff 1210 Colvin Avenue, Inc. ("Colvin") alleges that the defendant, Tops Markets L.L.C. ("Tops")[2], violated various provisions of the Robinson-Patman Anti- Discrimination Act, 15 U.S.C. §13 *et seq.*, by selling goods to Colvin for Colvin's resale at prices substantially higher than those charged to other retailers ("Favored Purchasers") in that Tops passed along to Favored Purchasers discounts and allowances received by Tops from its suppliers but failed to pass along to Colvin the same discounts and allowances.[3]  Colvin also alleges that Tops paid money and/or provided services to Favored Purchasers selling certain goods supplied by Tops, while failing to provide proportionally equal sums or assistance to Colvin for

---

[1]This decision may be cited in whole or in any part.

[2]Tops is a subsidiary of Dutch company Koninklijke Ahold N.V., d/b/a Royal Ahold, Inc. ("Ahold").

[3]In addition to its Robinson-Patman claims, Colvin also asserts claims of breach of contract and for an accounting.

its sales of the same or equivalent products.   Colvin alleges that Tops's conduct impaired its ability to compete with other local retailers including the Favored Purchasers.   Currently pending before the Court is Tops's Motion to Disqualify Colvin's trial consultants Bridgepoint Partners, LLC ("Bridgepoint") and Colvin's counsel, the law firm of McGee & Gelman.[4]

## BACKGROUND

Beginning in 1975, Colvin entered into several agreements with Tops whereby Colvin operated two B-Kwik retail grocery stores.   Thereafter, Colvin opened a third store and all three Colvin stores — as of the Fall of 2002 — were subject to License Agreements, Bookkeeping and Administrative Services Agreements, Supply Agreements and Scanning Agreements (collectively "Operating Agreements") with Tops.   Pursuant to the Operating Agreements, Colvin deposited money into an account with Tops ("the Code Account") and Tops would utilize those funds in order to satisfy certain financial obligations of Colvin including payments to suppliers and payroll.[5]

---

[4]This Motion was initially made in September 2004 and was denied without prejudice in November 2004 so that the parties could conduct discovery to determine whether and to what extent privileged information had been communicated to Bridgepoint's owners Daniel Fulham and Michael Casciano during their previous employment with Tops and the extent to which any such information may have been disclosed by Bridgepoint to McGee & Gelman.

[5]Colvin alleges that the funds deposited into the Code Account were co-mingled with Tops's general funds.

Colvin alleges that Tops — in order to increase its profitability and bolster the flagging finances of its corporate parent, Ahold — began to withhold from Colvin certain price discounts and allowances it had previously provided and failed to provide money payments and/or services for the sale of certain goods, but that Tops continued to provide the discounts and allowances, money payments and/or services to Favored Purchasers.   Thereby, Tops's profitability increased and Colvin's profitability decreased.  Colvin alleges that such conduct took place from on or before August 2002 until on or about July 2003, when Colvin's affiliation with Tops was terminated.

Colvin first brought this dispute to Tops's attention by a March 2003 letter from its counsel, McGee & Gelman.  Upon receipt of Colvin's letter, Tops began an internal investigation of the claims.  In April 2003 the parties engaged in negotiations in an effort to resolve the dispute, but such efforts failed and Colvin commenced this lawsuit on May 30, 2003.

On May 6, 2004, Colvin retained Bridgepoint Partners, LLC ("Bridgepoint") to assist Colvin in this litigation.  Bridgepoint is a consulting firm owned in part or in whole by Michael Casciano ("Casciano") and Daniel Fulham ("Fulham"), two former Tops employees.  Both Casciano and Fulham worked at Tops at the time the dispute came to light and Casciano continued to work at Tops after this lawsuit was

commenced and until January 2004.[6]  In September 2004, Tops filed a motion to

disqualify both Bridgepoint and McGee & Gelman.  By Order dated November 26,

2004, this Court denied the motion without prejudice and directed the parties to

undertake discovery as to the extent of Casciano's and Fulham's exposure, if any, to

Tops's privileged information while employed there and the extent of Bridgepoint's

work for Colvin.  Upon completion of that discovery, Tops re-filed the instant Motion.

## FACTS

Tops employed Fulham from August 1996 to May 2003.[7]  At the time of the

relevant events, Fulham was Director of Category Management.[8]   From November

1993 to January 2004, Tops employed Casciano as, among other things, Senior

Director of Category Management Support.  (Casciano 2005 Dec. ¶ 9.) In his position,

Casciano performed analyses of "billbacks" and other pricing issues relevant to the

relationship between Tops and B-Kwik grocery store owners, including Colvin.

Casciano routinely provided both the bases for his analyses and the results thereof

to B-Kwik owners, including Colvin. (Casciano 2005 Dec. ¶ 16, 18.)

---

[6]Fulham left Tops's employ in May, 2003, the same month as this litigation was commenced.

[7]At the time the dispute at issue arose, both Casciano and Fulham reported to Tom Heine, a Senior Vice President of Tops.

[8]Fulham's position involved "merchandising and contracts with vendors."  (Fulham Oct. Aff. ¶ 10.)

Even after this dispute came to light, Casciano continued to perform such analyses and continued to share his results with Colvin.  For example, sometime after the dispute came to light, Casciano informed Colvin that his analyses showed that Tops owed one of Colvin's stores more than $31,000 — significantly more than the $12,000 Colvin claimed it was owed.  (Casciano 2005 Dec. ¶ 12, 25.)  Not all such information continued to be shared, however.  Casciano declined to share with Colvin an analysis of billbacks in July 2003, noting that he was doing so "per John Mineo"[9] and that all communications concerning the billbacks were being funneled through Mineo.[10]  (Casciano 2005 Dec. ¶ 33.)  Casciano believed he was instructed not to share the results either because the results were not complete or because in-house counsel wanted a single point of contact with Colvin in light of the litigation.  (Casciano 2005 Dec. ¶ 34.)

Casciano and Fulham participated in Tops's efforts to investigate Colvin's complaints and in Tops's efforts to resolve the dispute short of litigation.  At their supervisor's request, both Casciano and Fulham reviewed Colvin's March 2003 letter outlining its complaints.  (Casciano 2005 Dec. ¶ 13; Casciano Depo. at 22-23.)  Both Casciano and Fulham were the recipients of several e-mails pertaining to the dispute

---

[9]At that time, John Mineo was Tops's General Counsel.

[10]It is unclear whether the analysis Casciano declined to share with Colvin in July 2003 was specifically performed at the request of counsel or was prepared in the ordinary course of business but simply not disclosed.

- 5 -

from Tops's General Counsel John Mineo.[11]  In late March or early April 2003 Casciano and Fulham attended a meeting of certain Tops executives and Tops's in-house and litigation counsel in preparation for a negotiation meeting with Colvin and its representatives, including McGee & Gelman.  (Casciano 2005 Dec. ¶ 13, 30.)  Both Casciano and Fulham attended that negotiation meeting on April 1, 2003.[12]  (Casciano 2005 Dec. ¶ 13.)  Casciano also attended a follow-up meeting after the negotiation. At the meetings, Tops's counsel discussed the facts of the case and divulged their mental impressions, strategy and theories of defense.[13]  Casciano did not consider any information divulged at those meetings to be protected by the attorney-client privilege and stated that he has no general understanding of the parameters of that privilege.[14]

---

[11]Tops has attached a log of such e-mails to Mineo's affidavit.  Tops asserts that the e-mails themselves are protected by the attorney-client privilege and has not disclosed them to Colvin.  Tops has, however, submitted the e-mails to the Court — without prior authorization — *ex parte* for the Court's *in camera* consideration.  Not surprisingly, Colvin strenuously objects to the submission of such materials.  The Court will discuss the disposition of such materials *infra*.

[12]Fulham asserts that his participation in the April 1, 2003 meeting was not extensive — perhaps consisting of a verbal response to a question by Heine.  Fulham claims no responsibility for any strategic decision-making with respect to the claim, or even significant factual input. He asserts that he attended no meetings after April 1, 2003 with respect to this matter and that he left Tops in May 2003.  Fulham Oct. Aff. ¶¶ 13-16.

[13]Casciano does not dispute that strategy may have been divulged but argues rather that he has no recollection of that which may have been discussed.  Casciano 2005 Dec. ¶ 43.

[14]At his deposition, Fulham explained that his "understanding of what would be privileged is specific things that happened that would have been in a one-on-one or a closed-door meeting with Tops' general counsel, specifically the case that it was absolutely not to be shared, a confidentiality agreement signed, a statement having been made before the meeting started that it was attorney/client privilege ∗∗∗."  Fulham Depo. at 78, lns. 1-9.

Casciano was asked to investigate a portion of Colvin's claims regarding pricing and to provide information to Tops's executives and to counsel regarding the matters in dispute.  Casciano asserts that he provided only "factual" information, that he was neither asked for nor did he provide his opinion as to the matters in issue and that he did not recall being present at any time in which legal advice was being dispensed to Tops's executives.  (Casciano 2005 Dec. ¶ 31, 43.)[15]  Casciano spoke with Tops's litigation counsel by telephone on at least one occasion and reviewed at counsel's request a declaration or affidavit in support of a motion to dismiss to be filed with the Court.  (Casciano Depo. pp. 117-119.)

Casciano had no further contact with Tops's counsel regarding this matter and performed no task with respect to this litigation after September 2003.  Casciano continued to work for Tops until January 2004.[16]

After Casciano left Tops's employ in January 2004, he formed Bridgepoint together with Fulham.  (Casciano 2005 Dec. ¶ 10.)  In the Spring of 2004, Bridgepoint solicited Colvin through McGee & Gelman to provide consulting services regarding the instant matter because Casciano and Fulham believed their experience in the

---

[15]In paragraph 43 of his declaration, Casciano states "I do not remember discussing 'litigation strategy' with any of the lawyers who worked on the case.  It was not part of my job to craft or direct Tops's strategy for dealing with the plaintiff's claim and lawsuit.  ***.  No one asked my opinion as to whether the case should be settled or defended vigorously, or about legal tactics.  Nor were the Tops lawyers giving advice to *me*."  Casciano 2005 Dec. ¶ 43 (emphasis in original).

[16]There is no suggestion that Tops sought or required Casciano's assistance with its defense of this action after September 2003 or at any time after Casciano's departure from Tops in January 2004.

industry generally and with Tops in particular would be useful to Colvin.  (Casciano

Dec. ¶ 49.)  Bridgepoint's retention letter of May 6, 2004 indicates that it would

provide various services to Colvin and McGee & Gelman, including:

> "identify business process and controls prior to 2001; identify changes
> to B-Kwik with MICS Pricing System in 2000; identify changes to B-Kwik
> with conversion to BIB bill back System 2001; identify changes to B-
> Kwik with initial transition from Wilson Farms Division to Supermarket
> Division in 2002; identify changes to B-Kwik with transition from Tops
> Super Distribution Center to C&S Wholesale/Erie Logistics 2002; map
> process changes and impact to each area of B-Kwik; provide detailed
> analysis of impact to cost, margin and shrink; provide expert testimony
> as required."

Bridgepoint Retention Letter (internal numbering omitted).

Casciano and Fulham were repeatedly warned by McGee & Gelman not to

disclose any communications they may have had with Tops's counsel.   (Fulham Oct.

Aff. ¶ 5, 23, 24; Casciano 2005 Dec. ¶ 50-53; McGee 2004 Dec. ¶¶ 5-9.)[17]  Casciano and

Fulham were given such warning at every or nearly every meeting with Colvin's

counsel.  (Casciano 2005 Dec. ¶ 54.)  Casciano and Fulham deny that they have ever

disclosed to Colvin or to McGee & Gelman any communications they may have had

with counsel for Tops.   (Fulham Oct. Aff. ¶ 4, 22; Casciano 2005 Dec. ¶ 1(a), 55.)

Likewise, McGee & Gelman denies that Casciano or Fulham ever revealed any

---

[17]McGee advised Casciano and Fulham that "no disclosure should be made of any discussions or other communications which Casciano and/or Fulham might have had with the litigation attorneys and/or in-house counsel for Tops."  McGee 2004 Dec. ¶ 5.  McGee also "expressly told Casciano and Fulham that there should be no disclosure of Tops'[s] litigation strategy, settlement position or any other related information which either or both of them might have had exposure to during their tenure at Tops."  *Id*. at ¶ 7.

communications they may have had with Tops's counsel.  (McGee 2004 Dec. ¶¶ 5-9;

McGee 2005 Dec. ¶ 16.)  McGee states:

> "No disclosures of any communications between Casciano and/or
> Fulham and any Tops attorneys or any of [litigation strategy, settlement
> position or any other related information] were ever made to me by
> Casciano or Fulham, nor did I ever hear any such disclosures being
> made to any other person or persons. Specifically, no one at Bridgepoint
> has ever disclosed any privileged or non-discoverable information or
> document to McGee & Gelman or to anyone employed by Colvin or
> working on behalf of Colvin, either as an attorney, consultant or
> otherwise."

McGee 2004 Dec. ¶ 9.

Since being retained, Bridgepoint has, among other things, made various

PowerPoint presentations to Colvin and McGee & Gelman concerning Tops's pricing

structure and operations.  Bridgepoint has assisted in reviewing and categorizing

thousands of documents provided by Tops in discovery.  Bridgepoint also has given

Colvin the names of other individuals at Tops who might have information relevant

to the litigation and has referred to Colvin individuals who may be able to serve as

expert witnesses with respect to the issue of "relevant geographic market."  Finally,

Bridgepoint has performed various mathematical analyses in order to verify Colvin's

claimed damages.

> Fulham states that his assistance to Colvin has included
>
> "providing factual information about the business relationships and
> pricing issues that underlie this dispute, and *** providing technical
> assistance so that its attorneys can understand the documents that
> have been produced during discovery and the financial impact of the
> transactions between the parties."

Fulham Oct. Aff. ¶ 25.

As partners of Bridgepoint, Casciano and Fulham have, after receipt of an initial retainer of $7,500, billed for their services at an hourly rate of $225.  (Casciano Dec. ¶ 63.)  Bridgepoint has been paid approximately $70,000 thus far for the services it has rendered to Colvin.

## **DISCUSSION**

A.  Motion to Disqualify Bridgepoint Partners, LLC

Tops seeks to disqualify Bridgepoint from any further participation in this matter because Bridgepoint's owners Casciano and Fulham are former employees of Tops and, as such, received confidential and privileged information regarding Tops's factual and legal position in this litigation.  Colvin argues that Bridgepoint cannot and should not be disqualified because Bridgepoint has provided only factual information to Colvin, that Casciano and Fulham are at most fact witnesses and that neither Bridgepoint, Casciano nor Fulham is Colvin's expert witness.

The Court notes that its authority to disqualify an attorney from further participation in a pending matter, as well as its authority to disqualify a party's expert witness, stems from its inherent power to preserve the integrity of the adversary process.  *See Hempstead Video, Inc.* v. *Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005); *see also Eastman Kodak Co.* v. *Agfa-Gevaert N.V.,* 2003 WL 23101783 (W.D.N.Y. 2003) (*citing Popular, Inc.* v. *Popular Staffing Servs. Corp.,* 239 F. Supp. 2d 150, 152 (D.P.R. 2003)).  While the relevant questions differ somewhat

depending on whether it is counsel or a witness against whom disqualification is sought, in both situations the crucial issue is whether the individual or entity against whom disqualification is sought has obtained or been exposed to confidential or privileged information belonging to the adversary in the litigation.

1. <u>Can Bridgepoint be disqualified?</u>

Colvin argues, as an initial matter, that Casciano and Fulham are fact witnesses and neither they nor Bridgepoint can be disqualified from further participation in this case. Colvin asserts that Casciano and Fulham have provided no information that could not be elicited in a standard deposition. Tops agrees that Casciano and Fulham may have knowledge of the facts relevant to this case, but argues that Casciano and Fulham — and hence, Bridgepoint — have provided litigation services to Colvin, not simply factual information. The Court agrees.

Bridgepoint has functioned more as a trial consultant for Colvin, rather than as a fact witness.[18]   Bridgepoint has been retained, in part, to provide general background and insight into the manner in which the grocery business is conducted. Bridgepoint has also provided analysis of how events at Tops affected B-Kwik stores in general and Colvin in particular. Bridgepoint has also done far more than identify and explain documents obtained in discovery. Bridgepoint has discussed and developed a strategy for Colvin to utilize in combing through the documents provided

---

[18]It also bears noting that, as a corporate entity, Bridgepoint itself is obviously not a fact witness. Only Casciano and Fulham, Bridgepoint's principals, are witnesses to some of the facts in this case.

by Tops in discovery — in an effort to concentrate the search for the most relevant and persuasive documents for Colvin's version of the events.   Finally, more than simply identifying others who may have relevant knowledge, Bridgepoint has provided the names of potential witnesses and identified the areas in which the potential witnesses' knowledge could be helpful to Colvin.   Such information and assistance is not normally provided by fact witnesses at deposition.   Accordingly, Bridgepoint is subject to possible disqualification.

2. <u>Should Bridgepoint be disqualified?</u>

"[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and received confidential information from the adverse party pursuant to the earlier retention." *Wang Labs, Inc.* v. *Toshiba Corp.,* 762 F. Supp. 1246, 1248 (E.D. Va. 1991). Even when the witness's prior relationship with the adversary was not necessarily that of an expert witness, courts seek answers to the following two questions: "(1) Did the adversary have a confidential relationship with the expert [against whom disqualification is sought]?; (2) Did the adversary disclose confidential or privileged information to the expert [against whom disqualification is sought] relevant to the current litigation?" *Eastman Kodak*, 2003 WL 23101783 at *1.

Colvin argues that Tops has failed to prove that (1) it had a confidential relationship with Casciano and/or Fulham and/or (2) that Tops disclosed to them

information relevant to this litigation as to which Tops had not waived privilege or confidentiality as against Colvin.[19]  Colvin also asserts that only communications are privileged and that facts, whether they are conveyed to counsel in privileged communications or otherwise, are not privileged.  Finally, Colvin argues that any fear of future disclosure of privileged or confidential communications can be eliminated by the entry of a protective order.

Casciano and Fulham both were employees of Tops.  As employees they were required to complete and did complete a conflict of interest questionnaire which notified employees that they were not to disclose Tops's confidential information.[20]  Furthermore, while they argue that they do not recall the substance of such conversations, both Casciano and Fulham were present at meetings with Tops's executives and counsel in which the matters in dispute were discussed.  Casciano was present at meetings in which the strengths and weaknesses of Tops's position were discussed.  Thus, it cannot be reasonably disputed that confidential information was disclosed to Casciano and Fulham during their employment at Tops.

---

[19]In other words, Colvin argues that any allegedly confidential and/or privileged information allegedly disclosed by Tops to Casciano and/or Fulham had already been disclosed by Tops to Colvin in the ordinary course of business such that it may have been confidential as to outsiders but was not confidential as between Tops and Colvin.

[20]Tops has also submitted — in camera — various e-mails which allegedly demonstrate that Casciano and Fulham received confidential and/or privileged information regarding this litigation.  Colvin objects to the Court's consideration of such materials, arguing that Tops failed to properly place the materials before the Court by seeking permission to supply the same or to file the same under seal.  Colvin alleges that consideration of the in camera materials would run contrary to Due Process.  The Court has not and need not consider the in camera submission because other evidence — including Casciano and Fulham's own statements — makes clear that confidential information was disclosed to them by Tops.

Instead, Colvin argues that to the extent such information was disclosed, the same information was also routinely disclosed to Colvin such that there was no confidential information as between Tops and Colvin.  In support, Colvin asserts that Casciano routinely provided information to Colvin concerning pricing issues and continued to do so even after this litigation was commenced.

Colvin fails to address, however, the undisputed fact that both Casciano and Fulham were present in meetings with Tops's counsel in which litigation strategy was discussed.  The fact that they claim to have no recall of the specifics of that information is of no moment.  Tops has shown that it had a confidential relationship with Casciano and Fulham and that confidential and/or privileged information was disclosed to them in the course of that relationship.  Accordingly, Tops's Motion to Disqualify Bridgepoint Partners LLC is granted.

B.  <u>Motion to Disqualify McGee & Gelman</u>

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process."  *Hempstead Video, Inc.* v. *Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).  "In a technical sense the only truly binding authority on disqualification issues is Second Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority."  *Occidental Hotels Mgt. B.V.* v. *Westbrook Allegro, LLC,* 440 F. Supp. 2d 303, 308 (S.D.N.Y. 2006) (*quoting Skidmore* v. *Warburg Dillon Read LLC*, 2001 WL 504876 at * 2 (S.D.N.Y. 2001)).  On disqualification motions, courts

look to the state's disciplinary rules but "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video*, at 132.

Motions for attorney disqualification "are generally viewed with disfavor in this Circuit" and "a party seeking disqualification must meet a high standard of proof before disqualification will be granted." *Marshall* v. *State of New York Div. of State Police*, 952 F. Supp. 103, 106 (N.D.N.Y. 1997).  The burden must be high because disqualification impacts "a client's right freely to choose his counsel — a right which of course must be balanced against the need to maintain the highest standards of the profession." *Evans* v. *Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir. 1983) (internal citation and quotation omitted).  The court must also consider disqualification motions cautiously because such "are often interposed for tactical reasons." *Board of Education* v. *Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

Attorney disqualifications generally occur only in cases where an attorney's conflict of interest undermines the Court's confidence in counsel's representation of his client or where an attorney is in a position, potentially, to use privileged information gained from the other side, for example through prior representation. *Nyquist*, at 1246.  When counsel's conduct "threatens to affect the integrity of the adversarial process, [the court] should take appropriate measures, including disqualification, to eliminate such taint." *MMR/Wallace Power & Industrial, Inc.* v.

*Thames Associates*, 764 F. Supp. 712, 718 (D.Conn. 1991) (*citing Papanicolaou* v.

*Chase Manhattan Bank, N.A.,* 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989)).

Tops argues that McGee & Gelman must be disqualified because it has

violated New York Disciplinary Rule 4-107 in that counsel has had *ex parte*

communications with a party known to be represented by counsel.[21]  Tops also

argues that Canon 9 has been violated because McGee & Gelman's retention of

Bridgepoint Partners creates the appearance of impropriety.  Finally, Tops argues

that the nature of the work performed by Bridgepoint demonstrates that Tops's

confidential information has been disclosed to Colvin and that — based on the

rationale of *MMR/Wallace, supra,* — even if Tops has not shown actual disclosure,

disclosure should be presumed under the circumstances of this case.

The Court will not focus on whether or not there has been a violation of New

York's ethical rules.  That question can be addressed in a more appropriate forum, if

necessary.  This Court's primary function is not to discipline attorneys but rather to

maintain the integrity of the adversary process.  The real issue for this Court is

whether McGee & Gelman's conduct — whether or not it comports with New York's

ethical rules — impermissibly taints these proceedings.

As noted, Tops relies heavily on the rationale of *MMR/Wallace* and argues that

the Court should adopt the *MMR/Wallace* framework in determining this motion.  The

---

[21]Tops argues that such contact also violates Rule 4.2 of the American Bar Association's ("ABA's") Model Rules of Professional Conduct.  Neither New York State nor this Circuit has adopted the ABA's Model Rules as the standard of professional conduct.

*MMR/ Wallace* court sought the answers to three questions, which, as tailored to the instant case are as follows:   Did Casciano and/or Fulham have confidential or privileged information pertaining to Tops's trial preparation or strategy?  Assuming that at least one of them had such information, did they disclose it to McGee & Gelman?  If such information was disclosed, does it threaten to taint all further proceedings in the case?

Here, it is undisputed that Casciano was present at three meetings between Tops's executives and Tops's counsel.  At those meetings, counsel discussed their mental impressions of the claims and possibly discussed Tops's strategy in defending this matter.  Casciano and Fulham were both copied on numerous confidential and/or privileged e-mails concerning this dispute while at Tops. Casciano prepared a financial analysis of some or all of the issues involved in this litigation for Tops.  Finally, Casciano had some conversations with Tops's litigation counsel and reviewed at least one document to be filed with the Court in this litigation.   Accordingly, the Court finds that Casciano and Fulham possessed confidential or privileged information belonging to Tops.

The Court next considers whether Casciano or Fulham may have disclosed such information to McGee & Gelman.  Tops first argues that its evidence shows that privileged information has in fact been disclosed to McGee & Gelman.  In support of that argument, Tops asserts that a damages analysis performed by Bridgepoint for

Colvin is similar to the one performed by Casciano for Tops.[22]  Tops also points to the fact that Bridgepoint referred Colvin to experts in the area of "relevant geographic market" and that Bridgepoint identified Tops employees according to the category of damages in which their testimony would be helpful to Colvin.  Tops also argues that, even if its evidence does not demonstrate actual disclosure of Tops's information to Colvin, Bridgepoint should be presumed to have done so by the nature of its relationship — *i.e.,* that of a paid consultant — to Colvin.

Tops contends that, because an analysis of Colvin's claimed damages prepared by Bridgepoint includes an analysis of "billbacks" for the time period encompassed by Casciano's July 2003 analysis for Tops, Bridgepoint's analysis must contain privileged and/or confidential work product belonging to Tops and therefore Casciano must have disclosed Tops's work product to Colvin.  The Court does not find such argument persuasive.  Both Casciano and Fulham assert that they took no Tops documents with them upon their respective departures from Tops.  Tops has no evidence contradicting such representations.  Accordingly, there is no indication that Bridgepoint used any documents protected by the attorney-client privilege or the attorney work product doctrine in preparing any analysis for Colvin.  Tops's argument is further contradicted by the fact that Bridgepoint's analyses for Colvin were clearly works in progress.  Tops attached three analyses provided to Colvin — one on June 24, 2004 and two on June 25, 2004.  The total amount of damages is different in each

---

[22]The similarity Tops asserts is that both analyses concern the same time period.

such analysis, albeit by small sums.  The indication, however, is that analysis was

ongoing and not simply based on the analysis Casciano performed for Tops the prior

year.

Tops further argues that actual disclosure of its privileged and/or confidential

information is demonstrated by the fact that Bridgepoint referred Colvin to certain

experts in the field of "relevant geographic market."[23]  The concept of "relevant

geographic market" is crucial to the success of Colvin's price discrimination claims

under 15 U.S.C. §13(a).  That section states in pertinent part:

> "It shall be unlawful for any person engaged in commerce, in the course
> of such commerce, either directly or indirectly, to discriminate in price
> between different purchasers of commodities of like grade and quality,
> where either or any of the purchases involved in such discrimination are
> in commerce, *** and where the effect of such discrimination may be
> substantially to lessen competition or tend to create a monopoly in any
> line of commerce, or to injure, destroy or prevent competition with any
> person who either grants or knowingly receives the benefit of such
> discrimination, or with customers of either of them ***."

15 U.S.C. §13(a).  In order to demonstrate an injury to commerce caused by the

alleged price discrimination, Colvin must show that it was in competition with the

Favored Purchasers.  *See Best Brands Beverage, Inc.* v. *Falstaff Brewing Corp.,* 842

F.2d 587 (2d Cir. 1987) (stating that in order to establish a competitive nexus

between purchasers it must be shown that as of time of imposition of price

differential purchasers competed at same functional level — *i.e.,* all wholesalers or

---

[23]This argument was presented in a footnote in Tops's reply memorandum.  Other than
stating the assertion, Tops provided no explanation as to how such fact indicates that its
confidential information was disclosed to Colvin.

all retailers — and within the same geographic market).[24]   Accordingly, the Court does not find that Bridgepoint's involvement in the referral of such experts demonstrates that Bridgepoint disclosed Tops's confidential information to Colvin.

Finally, Tops argues that, even if its evidence does not demonstrate actual disclosure of its privileged or confidential information, such disclosure should be presumed in light of the nature of Bridgepoint's relationship with Colvin.  In support of its argument, Tops relies heavily on the case of *MMR/Wallace, supra,* in which defense counsel was disqualified after retaining plaintiff's former project manager — who was extensively involved in plaintiff's preparation of the subject litigation — as a trial consultant.  The *MMR/Wallace* court concluded that a presumption arose that the employee had disclosed plaintiff's privileged information to defense counsel and — assuming that such presumption was rebuttable — the presumption had not been rebutted.[25]   The court discounted both defense counsel's and the employee's affidavits denying disclosure of any privileged information because the attorney could

---

[24] In *Texaco, Inc.* v. *Hasbrouck*, 496 U.S. 543, 567 (1990), the Supreme Court rejected the contention that price discrimination between wholesalers and retailers is exempt from the Act.

[25] In recognizing a presumption of disclosure, the *MMR/Wallace* court relied on cases including *Hull* v. *Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975), and *Williams* v. *Trans World Airlines, Inc.*, 588 F. Supp. 1037 (W.D. Mo. 1984).  In both *Hull* and *Williams* the court presumed that the defendant's former employee had disclosed privileged or confidential information to plaintiff's counsel.  Importantly, however, both of those former employees approached each plaintiff's counsel for the purpose of retaining that counsel to represent them against their former employers.  It is rational to presume that those former employees would have disclosed all of the relevant information in their possession — regardless of its confidential nature — when seeking representation for themselves.

have been motivated to preserve any unfair advantage he had obtained[26] and

because the employee testified that he did not know what information was and was

not protected by attorney-client privilege.[27]   Tops argues that the Court should

likewise disqualify McGee & Gelman because neither Casciano nor Fulham fully

understands the parameters of the attorney-client privilege such that any warning

not to disclose privileged information was ineffective, and both were involved in the

preparation of Tops's defense.

The Court concludes that — even if a presumption arises that Casciano and/or

Fulham disclosed privileged or confidential information to McGee & Gelman — such

presumption has been sufficiently rebutted in this case.   The Court has been

presented with affidavits from Casciano, Fulham and McGee denying any disclosure.

Such affidavits have been held sufficient to rebut a presumption of disclosure.  *See

e.g., In re Methyl Tertiary Butyl Ether Products Liability Litigation,* 438 F. Supp. 2d

305, 309 (S.D.N.Y. 2006); *Team Obsolete Ltd.* v. *A.H.R.M.A. Ltd.,* 2006 WL 2013471, at

*4 (E.D.N.Y. 2006).

Moreover, these affidavits — unlike those in *MMR/Wallace* — affirm that

Casciano and Fulham made *no* disclosures of *any* communications they may have had

---

[26]The evidence in *MMR/Wallace* supports the conclusion that defense counsel had obtained an unfair advantage and intended to use it in that the employee admitted to defense counsel that he retained computer discs belonging to plaintiff and defense counsel had instructed the employee to copy the computer discs and return the originals to plaintiff's counsel.

[27]Defense counsel and the employee affirmed that counsel had instructed the employee not to reveal any privileged information.

with Tops's counsel.  Thus Casciano's and Fulham's ability, or lack thereof, to distinguish privileged communications from non-privileged communications is irrelevant as they were instructed not to disclose any communications and they affirm that they complied with that instruction.

*MMR/Wallace* is further distinguishable on the facts. The MMR/Wallace employee had significantly more involvement with MMR/Wallace's litigation preparation than did Casciano or Fulham in this case.  In fact, the MMR/Wallace employee's exclusive function for nearly a year prior to his termination had been to organize plaintiff's documents for litigation, review and digest materials provided by the defense and to assist plaintiff's counsel in responding to discovery demands, taking depositions and preparing pleadings.  Even after he had been transferred to another work location, that employee continued to assist plaintiff's counsel and had been approached by plaintiff to consider a position as a trial consultant.  Casciano's and Fulham's involvement in Tops's preparation was, in comparison, peripheral at best and had concluded even prior to Casciano's departure from Tops.

Finally, the Court concludes that — even if the presumption has not been effectively rebutted — McGee & Gelman's continued representation does not threaten to taint the integrity of these proceedings and disqualification is not required.  The only threat of taint to which Tops points is a lingering "nagging suspicion" that Colvin has been unfairly advantaged.  Under the circumstances of

this case, however, disqualification of counsel would not provide any remedy beyond that already provided by the disqualification of Bridgepoint.

In support of this Motion, Tops has attached exhibits consisting of extensive portions of the work product produced by Bridgepoint for Colvin.  Contained in such exhibits are: the list of services to be performed by Bridgepoint, copies of PowerPoint presentations explaining the pricing processes employed by Tops, copies of damages analyses — including those allegedly based on Tops's work product and/or privileged information — performed by Bridgepoint for Colvin, correspondence regarding potential expert witnesses in the area of "relevant geographic market," correspondence from at least one such potential expert witness in which he outlines the type of analysis he would perform, and a document in which Bridgepoint identifies contents of boxes of discovery materials provided by Tops and outlines its strategy for culling through such documents.  While such exhibits certainly do not represent all of the work performed by Bridgepoint for Colvin, they represent a significant amount of such work — work which, according to Tops, is tainted.

Tops has placed those documents into the public domain.  Even if the Court were to disqualify McGee & Gelman, any successor counsel would be entitled to access and use the information contained in that work.  Thus, even if the Court were to conclude — which it does not — that McGee & Gelman should be disqualified from further representing Colvin because of the appearance of taint, any successor counsel would be entitled to utilize certain of these purportedly tainted documents.

Accordingly, disqualification of counsel, in this case, would not serve to eliminate any

potential taint.

## **CONCLUSION**

For the above stated reasons, it is accordingly **ORDERED** that Tops's Motion

to Disqualify Bridgepoint Partners LLC is granted and Tops's Motion to Disqualify

McGee & Gelman is denied.

DATED:      Buffalo, N.Y.

December 27, 2006



_____/s/ John T. Elfvin_____
                    JOHN T. ELFVIN
                    S.U.S.D.J.